UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MERCEDES SANTANA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 15-cv-13232-IT |
| | * | |
| CAROLYN W. COLVIN, Commissioner | * | |
| of the Social Security Administration, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

December 23, 2016

TALWANI, D.J.

I.  Introduction

Plaintiff Mercedes Santana ("Santana") seeks judicial review of a final decision by the Commissioner of Social Security Carolyn Colvin ("Commissioner") denying Santana's application for disability insurance benefits and supplemental security income benefits. Motion to Reverse and Remand the Decision of the Commissioner [hereinafter "Pl.'s Mot."] [#16]. The Commissioner has filed a Motion to Affirm the Commissioner's Decision [hereinafter "Def.'s Mot."] [#22]. For the following reasons, Santana's motion is ALLOWED and the Commissioner's motion is DENIED. This matter is REMANDED for further proceedings consistent with this order.

II.  Background and Procedural History

The Social Security Administration is authorized to pay disability insurance benefits

(Title II) and supplemental security income (Title XVI) to persons who have a disability.[1] "A person qualifies as disabled, and thereby eligible for such benefits, 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" Barnhart v. Thomas, 540 U.S. 20, 21-22 (2003) (quoting 42 U.S.C. §§ 423(d)(2)(A)).

Plaintiff Mercedes Santana is a 52 year old woman suffering from "chronic pain and mental impairments." Pl.'s Mot. 1. On April 10, 2012, she filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income. (Administrative Record 12, hereinafter "R."). Both applications were predicated on an alleged disability beginning on September 2, 1999, and both applications were initially denied on June 27, 2012, and denied again, upon reconsideration, on November 15, 2012. (R. 12). Upon request for a hearing, Santana appeared and testified on April 1, 2014. (R. 12).

On August 28, 2014, the Administrative Law Judge ("ALJ") issued an unfavorable decision. (R. 9-30). The Appeals Council declined to review the decision, rendering it the final decision of the Commissioner. (R. 1). Santana filed the instant motion on February 23, 2016, challenging the ALJ's denial of disability beginning in March of 2009, with the principal contention of error at the ALJ's step four determination. [#16].

III.     Standard of Review and Administrative Procedures

An individual may obtain judicial review of the Commissioner's decision, and the court

---

[1] For purposes of this Order, there are no material differences between the regulations promulgated under Title II and Title XVI pertaining to the determination of a "disability." Citation throughout will primarily be to regulations promulgated under Title II, *i.e.* 20 C.F.R. § 404 *et seq.*

2

may affirm, modify or reverse the decision, with or without remanding the cause for a rehearing. 42 U.S.C. §§ 405(g), 1383(c). A denial of benefits must be upheld, however, "unless the [Commissioner] has committed a legal or factual error in evaluating a particular claim." Manso-Pizarro v. Sec'y Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quotation marks and citation omitted). In reviewing such denial, the Commissioner's findings of fact are conclusive if they are supported by substantial evidence, 42 U.S.C. § 405(g), and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriquez v. Sec'y Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

The Social Security Administration has promulgated regulations establishing a five-step sequential evaluation process to determine disability. See 20 C.F.R. § 404.1520(a)(4). At step one, the agency considers work activity, and whether the claimant is doing substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the agency looks to the medical severity of the impairment. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the agency looks to whether the impairment meets or equals the list of impairments presumed severe enough to render one disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. § 404 Subpt. P, App. 1. If the impairment does not so qualify, at step four the agency looks to the claimant's Residual Functional Capacity, that is, her ability to work despite her impairment, and whether the claimant can perform her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv). The burden of proof is on the claimant for steps one through four. At the fifth step, the agency considers vocational factors (age, education and past work experience) to determine whether, given the claimant's residual functional capacity, the claimant is capable of performing other jobs existing

in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(v); see also Barnhart, 540 U.S. at 24-25. It is the government's burden to prove that there are sufficient jobs in the economy that the claimant can perform. Tavarez v. Comm'r of Social Security, 138 Fed. Appx. 327, 329 (1st Cir. 2005) (per curiam).

IV.   The ALJ Decision

Proceeding along the five-step sequential determination of Santana's disability, the ALJ made the following findings of fact and conclusions of law.

At step one, the ALJ opined that Santana "may" have engaged in disqualifying substantial gainful activity, but he did not determine that a step one disqualification would be appropriate. (R. 14-15).

At step two, the ALJ determined that Santana suffered from "severe" impairments, including lumbar spine degenerative changes, fibromyalgia, chest pain, depressive and anxiety disorders, and a history of substance abuse. (R. 15).

At step three, the ALJ determined that these impairments failed to meet or equal, either on their own or in the aggregate, the severity presumed severe enough to render Santana disabled without further assessment. 20 C.F.R. § 404, Subpart P, Appendix 1. (R. 15).

At step four, the ALJ first determined that Santana retained a Residual Functional Capacity to perform "light work" (defined at 20 C.F.R. § 404.1567(b) and 416.967(b)) if limited to only occasional "postural maneuvers," and if able to avoid climbing ladders, ropes, and scaffolds. (R. 16). The ALJ further limited the Residual Functional Capacity with the caveat that Santana's "mild" mental impairments allowed her to "understand and carry out 2-3 step tasks and maintain concentration, persistence, and pace for 2-hour increments during an eight out workday over a forty hour workweek." (R. 16). Relying on vocational expert opinion, the ALJ

then determined that Santana's Residual Functional Capacity (with its limitations) allowed her to perform past relevant work as a fast food worker and counter attendant.

Although the ALJ found the step four determination sufficient to deny Santana's claims, the ALJ determined that if Santana's past relevant work was insufficiently gainful, requiring the ALJ to proceed to step 5, the decision would remain unfavorable. (R. 23). Specifically, the ALJ determined, based on vocational expert opinion, that sufficient jobs in the national economy existed that Santana could perform.

IV. Discussion

    *A. The Treating Physician Rule*

Plaintiff centrally contends that the ALJ failed to correctly address and weigh opinion evidence from treating physicians when assessing her disability, and thereby erroneously calculated her Residual Functional Capacity. A different assessment (for example, an ability to perform only "sedentary" rather than "light" work, or a more than "mild" mental impairment) could result in a different Residual Functional Capacity and thus a different determination at both steps four and five, thereby necessitating remand.

Social Security regulations dictate the analytical path that an ALJ must follow when assessing the impact of medical opinions on an overall determination of disability. 20 C.F.R. § 404.1527. As a threshold matter, the ALJ "will always consider the medical opinions" in the petitioner's case. 20 C.F.R. § 404.1527(b). The ALJ generally will give "more weight" to opinions from "treating sources," in order to account for those sources' ability to provide "a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." 20 C.F.R. § 404.1527(c)(2). "A treating source is defined as a patient's 'own physician, psychologist, or other acceptable medical source' who has provided medical treatment

in an ongoing way." Hagan v. Colvin, 52 F. Supp. 3d 167, 174 (D. Mass. 2014) (quoting 20 C.F.R. § 404.1502).

An opinion from a treating source must be accorded "controlling weight" if two conditions are met: the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and is not "inconsistent with the other substantial evidence in" the petitioner's case record.[2] Id. If not "controlling," the treating opinion must still be evaluated against six criteria in order to fulfill the mandate that the ALJ "always give good reasons" when determining the weight a treating opinion deserves. 20 C.F.R. § 404.1527. Id. These six criteria include the length and frequency of the treatment relationship; the nature and extent of the treatment relationship; the amount of evidence offered in support of the treating relationship's opinion; the treating opinion's consistency with the overall record; the treating source's

---

[2] SSR 96-29 provides the following guidance on the term "substantial evidence":

This term describes a quality of evidence. Substantial evidence is "...more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (Richardson v. Perales, 402 U.S. 389 (1971), SSR 71-53c, C.E. 1971-1975, p. 418.) The term is intended to have this same meaning in 20 CFR 404.1527(d)(2) and 416.927(d)(2). It is intended to indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong. It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion.

Depending upon the facts of a given case, any kind of medical or nonmedical evidence can potentially satisfy the substantial evidence test. For example, a treating source's medical opinion on what an individual can still do despite his or her impairment(s) will not be entitled to controlling weight if substantial, nonmedical evidence shows that the individual's actual activities are greater than those provided in the treating source's opinion. The converse is also true: Substantial evidence may demonstrate that an individual's ability to function may be less than what is indicated in a treating source's opinion, in which case the opinion will also not be entitled to controlling weight.

specialization; and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

This analytical process is no mere formality. See McCumber v. Colvin, 2014 WL 4804750 at *7 (D. Mass. Sep. 25, 2014) ("'Controlling weight' is the term used to describe a medical opinion from a treating source that *must* be adopted the ALJ. . . . [U]nder the regulations, the ALJ is *required* to explain the weight given to a treating source opinion and the reasons supporting that decision.") (emphasis in original); see also Halloran v. Barnhart, 362 F.3d 28, 32 (2nd Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). And even when an ALJ does provide reasons for discounting a treating source opinion, remand is proper if those reasons are "unpersuasive" or "significantly flawed." See Johnson v. Astrue, 597 F.3d 409, 411-12 (1st Cir. 2009).

  B.  *Dr. Finger's Evaluation and the ALJ's Treatment Thereof*

The first relevant treating source opinion addressed by the ALJ comes from Dr. Finger. (R. 19). Dr. Finger completed a "Physical Residual Functional Capacity Questionnaire" dated September 10, 2013, in which she concluded that Santana "can lift less than 10 pounds, sit less than 2 hours, stand/walk less than 4 hours, has difficulty using her hands, has pain that would frequently interfere with concentration, and would require more than 3 absences per month." (R. 19). Such an assessment would *at most* justify a residual functional capacity to perform "sedentary" work. See 20 C.F.R. §§ 404.1567, 416.967 ("Sedentary work involves lifting no more than 10 pounds at a time . . . .").

The ALJ assigned "little weight" to Dr. Finger's assessment and concluded instead that Santana could perform "at least a light range of exertion and occasional postural maneuvers." (R. 19).

As an initial matter, the court notes that the ALJ failed to provide any analysis of five of the six criteria that must guide the ALJ's assessment of a treating source opinion. Although Dr. Finger described herself as Santana's primary care physician, and reports Santana having fifteen visits with her between January 2012 and September 2013 (R. 522), the ALJ's decision includes no discussion of the nature of Dr. Finger's treatment relationship with Santana, nor of the length or frequency of that relationship, nor of the evidence in support of Dr. Finger's opinion, nor of Dr. Finger's specialization. Such limited explanation renders it difficult "to determine that the Secretary applied the correct legal standards" and may be ground for reversal. Weiler v. Shalala, 922 F. Supp. 689, 694 (D. Mass. 1996).

Moreover, the reasons the ALJ *did* provide do not withstand light scrutiny. **First**, while the ALJ concluded that Dr. Finger's assessment was contradicted by "longitudinal objective medical evidence . . . showing normal diagnostic cardiac testing," an absence of cardiac treatment, and a lack of cardiac diagnoses (R. 15), this apparently normal cardiac testing and lack of cardiac treatment do not bear upon—let alone contradict—Dr. Finger's diagnosis of, *inter alia*, "chronic body pain, chronic joint pain, atypical chest pain, depression, anxiety [and] numbness." (R. 522). *These* diagnoses were the bases for Dr. Finger's determinations of Santana's physical limitations (and, further, are *consistent* with the ALJ's step two determination of severe fibromyalgia). (R. 525-527). Dr. Finger's Residual Functional Capacity evaluation did not touch upon cardiac conditions or any exertional limits stemming therefrom. The ALJ's discrediting of her opinion on grounds of normal cardiac performance is accordingly

unpersuasive.

**Second**, the ALJ's (lay) opinion that despite "degenerative spinal changes," a lack of "nerve root or spinal cord involvement or neuropathy" rendered Dr. Finger's (expert, treating) opinion undeserving of deference (R. 15) again runs contrary to the ALJ's own finding of severe fibromyalgia—which is characterized by *normal* "musculoskeletal and neurological examinations" and "no laboratory abnormalities." Johnson, 597 F.3d at 410 (quoting Harrison's Principles of Internal Medicine, at 2056 (16th ed. 2005)). Moreover, determinations such as the medical relevance of an absence of "nerve root or spinal cord involvement or neuropathy" (R. 18)—determinations apparently without root in medical opinions in the record—evince an impermissible interpretation of "raw data in a medical record." Manso-Pizarro, 76 F.3d at 17.

The ALJ's **third** reason—that "aside from pain, treating and examining sources have repeatedly observed intact strength, sensation, and gait" (R. 15)—appears at first blush the most credible (with the exception that "gait" appears irrelevant to Dr. Finger's Residual Functional Capacity evaluation). The ALJ roots (at R.18) this justification in Exhibits 4F, 11F pages 8, 13, 18, and 23F. (R. 372-381, 433, 437, 443 & 593-660).

Yet, these citations do not justify the ALJ's decision. Specifically, citations to Exhibit 11F appear directed entirely to "progress notes" drafted *by Dr. Finger* which do not appear to contradict Dr. Finger's Residual Functional Capacity conclusions. For example, Exhibit 11F page 8 (an evaluation following up on a kidney-stone-related hospitalization), Dr. Finger reports Santana's complaints of numbness, and references both the recurrence of numbness for several days after hospitalization and the need for further neurological evaluation. (R. 433). Page 12 (and 13) observe continuing pain and a suspicion of "musculoskeletal back pain," with no commentary on sensation or gait. (R. 437-438). Page 18 likewise contains no findings either

contradicting those in Dr. Finger's Residual Functional Capacity evaluation or the ALJ's step two conclusions of fibromyalgia.

Exhibit 23F consists of a series of notes taken during hospitalizations at Whidden Hospital for a variety of events, including chest pain, a car accident, and kidney stones. (R. 593-660). Taking these documents as whole, the court finds no meaningful inconsistencies with Dr. Finger's Residual Functional Capacity evaluation (and in fact observes several pertinent consistencies), and more importantly, notes that these hospital entries "do not relate these diagnoses to specific residual functional capabilities such as those set out in 20 C.F.R. § 404.1567(a)." Rosado v. Secy's of Health and Human Serv.'s, 807 F.2d 292 (1st Cir. 1986). In other words, the physicians treating Santana during hospitalizations for specific medical events like a kidney stone are not conducting an analysis sufficiently similar in kind to Dr. Finger's specific Residual Functional Capacity evaluation to meaningfully contradict that evaluation.

Finally, Exhibit 4F is a letter from a Dr. Nabil Ali to Dr. Finger, in which Santana is reported to have what appears to be normal neurological functioning. (R. 380). Again, the court finds relevant that the letter was addressed to Dr. Finger, and was thus information she presumably considered when completing her Residual Functional Capacity evaluation. But ultimately, given the record as a whole, this single letter—which appears tangential to the Residual Functional Capacity's actual findings regarding strength and sensation—does not amount to the "substantial evidence" contrary to Dr. Finger's conclusions.

In sum, the court notes that in Johnson, 597 F.3d at 412-413, the First Circuit remanded partially because the ALJ relied on unpersuasive *Residual Functional Capacity evaluations* that purported to contradict the treating physician's own Residual Functional Capacity evaluation. See also Berrios Lopez v. Secretary of Health and Human Serv's, 951 F.2d 427, 431-32 (1st Cir.

1991) (evaluating the relative credibility among several medical evaluations of functional capabilities). Here, the ALJ's judgment went one step further: he assigned "little weight" to Dr. Finger's Residual Functional Capacity evaluation when there were no other physical Residual Functional Capacity evaluations *at all*, contradicting or otherwise. See Rosado, 807 F.2d at 293-94.

The ALJ's **fourth and final** justification for assigning "little weight" was Santana's alleged lack of follow-through with treatment, and admissions of activities such as "taking care of her grandchild, housework, shopping, and going to the pool." The court first notes that the domestic activities just described—activities possibly carried out pursuant to sheer necessity—do not in and of themselves contradict Dr. Finger's conclusions. One can at least minimally take care of a grandchild, attend church, perform housework, shop and go to a pool even if—as Dr. Finger described Santana—she can sit for no more than 30 minutes continuously, stand for no more than one hour continuously, lift less than 10 pounds only occasionally, and only sit for two hours and stand/walk for a total of four hours in an 8 hour workday. (R. 525, 526). And finally, the somewhat sparse evidence provided by the ALJ for patient noncompliance does not sufficiently overcome the controlling errors identified here.[3]

---

[3] The Commissioner's memorandum argues further, citing Berrios Lopez v. Sec'y of Health and Human Serv's, 951 F.2d 427 (1st Cir. 1991), that Dr. Finger's Residual Functional Capacity assessment is a "physical checklist" that is not to be afforded much weight. Def's Mot. 12. (The same argument is made as to two additional Residual Functional Capacity evaluations which Santana contends are authored or countenanced by Dr. Crisostomo, Santana's treating mental health provider (Exhibits 17F and 19F)). Notably, the ALJ did not discount the treating providers' opinion for this reason. The court does not find that these evaluations are "checklists" within the meaning of Berrios Lopez. The Berrios Lopez court was addressing the reports from "*consulting, non-examining* physicians" who offer "little more than brief conclusory statements or the mere checking of boxes" and who do not at least "briefly mention[] all of [a] claimant's alleged impairments and state[] medical conclusions as to each." Id. at 431. The evaluations at issue here do not trigger any of these concerns: they were both completed by treating medical providers; they both offer "more than brief conclusory statements"; and they both at least briefly

In conclusion: the ALJ not only eschewed the analytical process required by the treating physician rule, but also replaced that analytical process with justifications that do not withstand comparison with the record. Further, the ALJ failed to explain whether these perceived flaws in Dr. Finger's evaluation militated against assigning "controlling weight" to her opinion, or simply factored into his assessment of what non-controlling weight to provide her. But it does not matter: in either case, the reasons provided are inadequate, and remand is therefore necessary.

    C.   *The ALJ's Treatment of Psychiatric Opinion Evidence*

The reasoning set forth *supra* has further application with regard to the ALJ's determination of Santana's mental impairments.

As an initial matter, the explicit application of the treating physician rule to "psychologists" and its reiteration that impairments may stem from "psychological abnormalities" underscore that ALJ's are bound to assess evidence of mental impairments on equal terms with physical impairments. 20 C.F.R. § 404.1527.

This point bears on the ALJ's decision because the record indicates Santana was under the ongoing psychiatric care of Dr. German Crisostomo (R. 455, 662, 664, 666, 672), rendering

---

mention Santana's medical impairments.

The Commissioner further seeks to discredit Dr. Finger's evaluations because of notations that state that some of her findings were "per patient report." This concern illuminates an error in the record. The record appears to contain a duplicate of "page 3" of Dr. Finger's evaluation: one at R. 524, and another at R. 525. These pages contain different notations and conclusions—and the second page does not contain the "per patient report" language identified by the Commissioner. The court is unable to determine which of the two is correct, whether one is included accidently, or whether Dr. Finger intentionally included two versions of this page—one containing Santana's own reports, and another Dr. Finger's independent conclusions. This discrepancy is cause for concern, as the court cannot adequately address the Commissioner's argument concerning reliance on Santana's subjective self-evaluation, nor adequately assess the ALJ's assessment of Dr. Finger's evaluation. On remand, the ALJ is directed to investigate and address this discrepancy in the record.

him a "treating source" under 20 C.F.R. § 404.1502 (a point the Commissioner does not appear to contest). Such would entitle his opinions—notably, those opinions which Santana asserts are his Residual Functional Capacity evaluations (Exhibits 17F and 19F)—to the treating physician process outlined above. [4] And such could significantly alter the ALJ's conclusions, as these purported Residual Functional Capacity evaluations (which may be entitled to significant if not controlling weight) describe mental disabilities severer than those the ALJ assigned to Santana.

Yet, to a further extent than described above concerning Dr. Finger's opinions, the ALJ failed to assess what Santana asserts are Dr. Crisostomo's opinions in the manner prescribed by 20 C.F.R. § 404.1527. In finding (at R. 20) that Santana's mental symptoms cause "no more than mild restriction[s]" as to daily living and "no more than mild difficulties" as to social functioning, the ALJ summarized his assessment of contrary and relevant medical opinion evidence (all of which he afforded "little weight") thusly:

> Treating source Malloy LMHC opined that the claimant has marked limitation in daily activities, social functioning, and maintaining concentration, would require more than 3 absences per month, and has poor to no ability to make simple decisions, complete a normal workday without psychological symptom interruption, and respond to work setting changes, (Exhibit 17F), essentially that she is totally mentally disabled from working. Likewise, another source opined that the claimant has marked limitation in daily activities, social functioning, and maintaining concentration, would require more than 3 absences per month, and has poor to no ability to complete a normal workday without psychological symptom interruption and respond to work setting changes (Exhibit 19F). Treating source Rickard MS opined that the claimant is unable to work, is unable to function with daily activities and deal with others (Exhibit 14F page11). Treating source Butler RN opined that the claimant is unable to work and sustain concentration (Exhibit 14F page10). These opinions as to total mental disability have all been considered but ultimately given little weight for several reasons. Although these sources all treated the claimant and some are acceptable medical source doctors, (SSR 06-03p), the longitudinal objective medical evidence and even several of the claimant's own

---

[4] The Commissioner contends Dr. Crisostomo's alleged signatures on these Residual Functional Capacity evaluations are illegible. Were illegibility the basis for the ALJ's perfunctory treatment of this evidence, the ALJ should have either resolved the question below or, in the least, explained in his opinion how the alleged illegibility affected the decision.

>   reports/admissions do not support such marked limitations and limitations as to total disability, for the reasons as just fully discussed above in this Finding in the discussion of each of the individual "paragraph B" criteria. (AR 22).

(R. 22) (emphasis supplied throughout).

This explanation entirely fails to evince how or whether the ALJ measured Exhibits 17F or 19F—the Residual Functional Capacity evaluations Santana contends are signed by Dr. Crisostomo—against the criteria set forth in 20 C.F.R. § 404.1527. In other words, the opinion lacks any evidence that the ALJ considered the "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone," but which can be provided by a treating physician. 20 C.F.R. § 404.1527(c)(2).[5]

Arguably the ALJ did comply with the directive that treating source opinions be compared with the record as a whole. But, contrary to the ALJ's findings on this point, the "longitudinal objective medical evidence" and Santana's own "reports/admissions" do not appear to facially contradict the "treating sources" the ALJ identifies. For example, Exhibit 17F—which (as the ALJ concedes) essentially states that Santana is totally, mentally disabled—notes also that she has "learned to adapt to her surroundings so long as they remain stable, safe, and support her physical and emotional needs." (R. 517). Such does not necessarily run contrary to the church attendance, child rearing, and various social and domestic activities the ALJ repeatedly cites as justification for discounting the medical opinions in the record. The same analysis attends the

---

[5] Indeed, opaqueness infects most of the ALJ's explanations concerning the psychiatric opinion evidence. For example, Exhibit 17F instructs the author, if not an MD or licensed psychologist, to obtain the co-signature of an individual licensed as such—which Sarah Malloy, LMHC clearly did. (R. 520). Yet the ALJ's opinion appears to attribute Exhibit 17F entirely to Mallow, ignoring the other signature. (R. 22). The ALJ's opinion further attributes Exhibit 19F to an "another source" without any specific commentary as to its authorship. (R. 22). Still further, the ALJ failed to assess any of the named opinion sources in accordance with the criteria set forth in 20 C.F.R. § 404.1527.

Residual Functional Capacity evaluation found at Exhibit 19F, and the statement from Richard MS (at R. 463), which appears primarily directed at Santana's ability to *work* rather than her ability to function as the ALJ describes. See Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons [ . . . ] and is not held to a minimum standard of performance, as she would be by an employer."). (Posner, J).

In sum, the ALJ's discussions of, and justifications for, discounting the several opinions contradicting his Residual Functional Capacity conclusion do not sufficiently demonstrate proper legal accordance with the treating source procedures. Without such a demonstration, remand is, again, necessary.[6]

V.     Conclusion

In light of the foregoing, the court ALLOWS Plaintiff's Motion to Reverse and Remand the Decision of the Commissioner [#16] and DENIES Defendant's motion to Affirm the Commissioner's Decision [#22]. Plaintiff's application is REMANDED for further proceedings consistent with this opinion. The court further DIRECTS the reviewing ALJ to resolve whether Santana is insured for SSDI benefits per the procedures listed in 20 C.F.R. § 404.130, in light of

---

[6] The court further notes, without reaching the issue, that the ALJ's assessment of Santana's pain and symptoms seems not to fully take into account the unique diagnostic and physiological realities of fibromyalgia, see Johnson v. Astrue, 597 F.3d 409 (1st Cir. 2009), a condition the ALJ found Santana suffers from to a severe degree, and thus a condition whose unique symptoms must be evaluated in accordance with 20 C.F.R. § 404.1529 (R. 15). As Johnson states: "[Once] the ALJ accepted the diagnosis of fibromyalgia, she also '*had no choice* but to conclude that the claimant suffer[ed] from the symptoms usually associated with [such condition], unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms.'" Id. at 414 (quoting Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994)) (emphasis in original).

her contention that some earnings have been falsely attributed to her. See Pl.'s Mot. 2 n.1.

    IT IS SO ORDERED.

December 23, 2016                                         /s/ Indira Talwani
                                                                                   United States District Judge